Stephen Z. Starr, Esq.
Vildan E. Starr, Esq.
STARR & STARR, PLLC
260 Madison Ave., 17th Floor
New York, New York 10016
tel. (212) 867-8165
fax. (212) 867-8139
email sstarr@starrandstarr.com

Attorneys for Debtor, Balasubramaniam J. Harid

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 Case No. |
|  | : |  |
| Balasubramaniam J. Harid, | : | 18-13632 (MEW) |
|  | : |  |
| Debtor. | : |  |
|  | : |  |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

* * * *

## LOCAL RULE 3017-1 DISCLAIMER

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT.**

* * * *

## DEBTOR'S DISCLOSURE STATEMENT, DATED MARCH 20, 2019

## I.    INTRODUCTION

This disclosure statement ("Disclosure Statement") is submitted by Balasubramaniam J. Harid ("Debtor") in respect of the Plan of Reorganization, dated March 20, 2019, of Balasubramaniam J. Harid under Chapter 11 of the United States Bankruptcy Code ("Plan"). Unless otherwise defined herein, all capitalized terms contained herein have the meaning given to them in the Plan, a copy of which is attached hereto as Exhibit A.

The Debtor filed this chapter 11 case to get a fresh start after it became clear to him he would be unable to satisfy his creditors' claims outside of bankruptcy.

**FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THIS DISCLOSURE STATEMENT, THE PLAN AND ITS EXHIBITS IN THEIR ENTIRETY**

## A. The Purpose of this Disclosure Statement

Certain creditors of the Debtor have the right to vote to accept or reject the Plan. The purpose of this Disclosure Statement is to provide information sufficient to enable such creditors to make informed judgments in exercising their right to vote on the Plan. This Disclosure Statement describes the material terms of the Plan and other related matters.

By Order dated April ___, 2019, the Bankruptcy Court approved this Disclosure Statement (the "Disclosure Statement Order"), determining that it contains "adequate information" as that term is used in § 1125 of the Bankruptcy Code.

**THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.**

The Disclosure Statement Order also sets forth in detail the deadlines, procedures and instructions for voting to accept or reject the Plan and for filing objections to confirmation of the Plan, the Record Date for voting purposes, and the applicable standards for tabulating Ballots. In addition, detailed voting instructions accompany each Ballot. Each holder of a Claim entitled to vote on the Plan should read in their entirety the Disclosure Statement, the Plan, the Disclosure Statement Order and the instructions accompanying the Ballots before voting on the Plan. These documents contain, among other things, important information concerning the classification of Claims for voting purposes and the tabulation of votes. No solicitation of votes to accept the Plan may be made except pursuant to § 1125 of the Bankruptcy Code.

## B. Holders of Claims Entitled to Vote

Pursuant to the provisions of the Bankruptcy Code, only holders of "allowed" claims or that are "impaired" are entitled to vote to accept or reject a proposed chapter 11 plan. Classes of claims in which the holders of claims are unimpaired under a chapter 11 plan are deemed to have accepted the plan and are not entitled to vote to accept or reject the plan.

Classes 1, 2 and 4 are not impaired under the Plan, are not entitled to vote on the Plan, and are deemed to accept the Plan. Class 3 Claims are impaired. To the extent Claims in Class 3 are Allowed Claims, the holders of such Claims are entitled to vote to accept or reject the Plan. Accordingly, the Debtor is soliciting acceptances only from holders of Allowed Claims in Class 3.

The Bankruptcy Code defines "acceptance" of a plan by a class of Claims as acceptance by creditors in that class that hold at least two-thirds in dollar amount and more than one-half in number of the claims that cast ballots for acceptance or rejection of the plan. For a more detailed description of the requirements for confirmation of the Plan, *see* § IV, "Confirmation Requirements and Procedures" below.

Section 1129(b) of the Bankruptcy Code permits the confirmation of a plan notwithstanding the lack of acceptance of a plan by one or more impaired classes of claims. Under that section, a plan may be confirmed by a court if it does not "discriminate unfairly" and

is "fair and equitable" with respect to each non-accepting class. For a more detailed description of the requirements for confirmation of a nonconsensual plan, *see* § IV, "Confirmation Requirements and Procedures" below. The Debtor intends to seek confirmation pursuant to § 1129(b) of the Bankruptcy Code with respect to any Class that rejects the Plan.

### C.    Voting Procedures

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan. If you hold Claims in more than one Class, and you are entitled to vote Claims in more than one Class, you will receive separate Ballots which must be used for each separate Class of Claims. Please vote and return your Ballot(s). Your Ballot(s) must be delivered either by mail or personal delivery, as follows:  Starr & Starr, PLLC, Attn: Stephen Z. Starr, 260 Madison Avenue, 17th Floor, New York, New York 10016.

TO BE COUNTED, YOUR BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED NO LATER THAN 5:00 P.M., PREVAILING EASTERN TIME, ON JUNE__, 2019 (THE "<u>VOTING DEADLINE</u>").

Any Claim in an impaired class as to which an objection or request for estimation is pending or which is scheduled by the Debtor as unliquidated, disputed or contingent is not entitled to vote unless the holder of such Claim has obtained an order of the Bankruptcy Court temporarily allowing such Claim for the purpose of voting on the Plan. For additional information on voting, *see* § IV, "Confirmation Requirements and Procedures" below.

### D.    Confirmation Hearing

Pursuant to § 1128 of the Bankruptcy Code, the Confirmation Hearing will be held on June ___, 2019 at ___:__ _.m., in Courtroom 617, before the Honorable Michael E. Wiles, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District New York, One Bowling Green, New York, New York 10004.

The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be served and filed so that they are received on or before May ___, 2019 at 4:00 p.m. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

## II.    BACKGROUND

### A.    Information Regarding the Debtor, His Employment
### History, Current Income and Employment

The Debtor is a 62 year old man residing in New York, New York. He is married, but legally separated from his wife, Dr. Jayalakshmi Harid ("<u>Dr. Harid</u>"). His background is as a trained chemist.

Prior to his involvement with Danbury Pharma LLC, he was involved in various business ventures, both domestically and internationally. However, the Debtor has no interest in any companies, both domestically and internationally, at this time.

The Debtor is currently employed as a consultant by Total Nutrition Global LLC ("TNG"), which is a company engaged in the nutraceutical, nutritional supplement and sports nutrition business. He does not have any ownership interest in TNG. Under the terms of his consulting agreement with TNG he receives $3,000 a month as a base payment, and in addition is entitled to a 3% commission on any collected sales. He is also entitled to be reimbursed ordinary, necessary and reasonable business expenses that he can show were undertaken in furtherance of his duties (i.e., business related travel, and expenses incurred for dining and entertainment of prospective customers). The arrangement between the Debtor and TNG is pursuant to a written agreement, dated as of August 16, 2018, that provides for an initial trial period of five (5) years and automatic one year renewal after that, unless terminated by either party sixty (60) days prior to the expiration date.

The Debtor also received $4,000 a month in spousal maintenance payments pursuant to a separation agreement with Dr. Harid that is discussed in further detail below.

## B.      Events Leading to Chapter 11 Filing

The Debtor was a co-founder of a company formed in 2008 known as Danbury Pharma LLC ("Danbury"), in which he held a majority (67%) interest. Danbury's line of business was in manufacturing and processing of pharmaceuticals and vitamins. While associated with Danbury the Debtor was in charge of product development, compliance (with FDA regulations) and oversaw operations. Another co-founder, David McLoughlin, was in charge of all the business aspects of Danbury and was President until he resigned in 2016. In 2013, Danbury entered into a factoring relationship with Crestmark Bank ("Crestmark"). In late 2015 and early 2016, while still under Mr. McLoughlin's stewardship, Danbury entered a period of significant financial distress, and had to replace its lender.

The situation was resolved by: (i) Mr. McLoughlin resigning his position and transferring his equity in Danbury to the Debtor, making the Debtor the sole owner of Danbury; (ii) the Debtor's payment of approximately $1.5 million to Crestmark; and (iii) Danbury's refinancing of the remaining approximate $1 million of debt to Crestmark.

Kevin Kelly, an experienced Chief Financial Officer and part-time consultant for Danbury was retained to assist Danbury in finding a replacement lender for Crestmark. At Mr. Kelly's suggestion Danbury obtained refinancing from Bibby International Trade Finance (now known as Bibby Financial Services, Inc.)("Bibby"), a finance company with which he had existing contacts and relationships.

On August 2, 2016, Bibby established a new $2,850,000 asset-based lending facility for Danbury. Danbury was allowed to borrow against eligible collateral up to $2,850,000. Eligible collateral included Danbury's inventory and eligible receivables. The Debtor also provided Bibby $675,000 to be held as cash collateral and executed a personal guaranty. In October 2016, Bibby conducted an on-site audit of Danbury's operations for the first three months of the facility. Bibby examined inventory and reviewed invoices and shipping documentation. Bibby

found no issues in its review of Danbury's operations and accounting during this audit. In connection with the audit, Bibby was presented with a binder containing copies of all invoices included in the borrowing base calculations, with copies of corresponding bills of lading or other acceptable proofs of shipping. The Debtor had no involvement with invoicing or the preparation of the borrowing base certificate.

In November 2016, Danbury's largest customer stopped placing additional orders due to dissatisfaction with recently delivered products. Subsequently additional problems arose with Danbury's remaining customers due to a change in invoicing practices instituted by Mr. Kelly. Formerly Danbury's customers were invoiced upon shipment and generally provided payment terms. However, many routinely paid late beyond the stated due date. Unfortunately, Bibby sent certain letters to Danbury's customers in an effort to collect on the factored accounts receivable which had a collateral effect of misleading Danbury's customers that Danbury had gone out of business, would not fill new orders and was in wind down mode in which its outstanding receivables were being collected.

Despite the Debtor's efforts to turn around Danbury's operations and continue it as a viable going concern, its ability to collect receivables for goods already sold and delivered, or generate new orders, was severely and irreparably impacted due to the impression created in the market by Bibby's demand letter to its customers that Danbury had gone out of business.

On or about April 3, 2017, Bibby commenced a lawsuit in New York Supreme Court, New York County captioned as *Bibby International Trade Finance, Inc. vs. Danbury Pharma, LLC and Balasubramaniam Harid* (Index No. 651771/2017)(the "Bibby Action"). The Bibby Action was commenced by way of a motion for summary judgment in lieu of complaint pursuant to CPLR § 321 seeking recovery of $2,850,000 plus interest, costs and attorneys' fees against Danbury pursuant to a loan and security agreement between Bibby and Danbury, and a promissory note made by Danbury in favor of Bibby in the same amount. As against the Debtor individually the Bibby Action sought the same recovery pursuant to a personal guaranty which he had executed in connection with the loan.

On or about November 20, 2017, the parties to the Bibby Action entered into a settlement stipulation (the "Stipulation") pursuant to which Danbury and the Debtor each stipulated to judgment in the amount of $2,850,000. As part of the Stipulation, certain releases were granted by Bibby in favor of the Debtor and by the Debtor in favor of Bibby as set forth in the Stipulation.

On December 19, 2017, a judgment (the "Bibby Judgment") pursuant to the Stipulation was entered in the total amount of $2,870,989.15. Bibby also holds certain collateral in the form of cash in the amount $670,000 that the Debtor personally posted as security for his loan guaranty. Bibby has neither returned these funds to the Debtor nor applied them against the Bibby Judgment. It is also not clear what disposition Bibby has made with respect to the assets of Danbury, which at the time funds were borrowed from Bibby were more than adequate to fully cover the loan. It is not clear that Bibby has engaged in commercially reasonable activity with respect to disposition of the Danbury collateral.

Due to Bibby's aggressive efforts to enforce the Bibby Judgment, as well as other debt problems with which the Debtor was faced, he determined to file chapter 11 bankruptcy to

restructure his personal financial affairs. Total unsecured claims against the Debtor are $3,726,508, which include $855,518.90 in claims of creditors other than Bibby.

## C.    Significant Events During the Chapter 11 Case

The Debtor is current with his obligations as a debtor and debtor in possession under the Bankruptcy Code

On February 8, 2019, pursuant to § 327 of the Bankruptcy Code, the Bankruptcy Court entered an order authorizing the Debtor to retain and employ Starr & Starr, PLLC as its counsel, *nunc pro tunc*, to November 28, 2018.

The Debtor will shortly file an application to obtain a deadline for the filing of proofs of claim, which he anticipated will be set for a date in May. The amount of creditor's claims will not affect the feasibility of the Plan since creditors will share on a *pro rata* basis the payments under the Plan.

The deadline to assert that the Debtor is not entitled to receive a discharge of any debts under § 1141(d)(3) of the Bankruptcy Code, or to have a debt excepted from discharge under §§ 523(a)(2), (4), or (6) expired as to all creditors and parties in interest, other than Bibby, as of March 11, 2019. With respect to Bibby, while the Debtor does not believe that Bibby possesses any valid nondischargeabilty claims, the Debtor entered into a stipulation with Bibby extending its time through April 10, 2019 to file a complaint to have its debt excepted from discharge under §§ 523(a)(2), (4), or (6). The Debtor will see if issues with respect to Bibby can be resolved consensually without the need for further litigation between the parties. As discussed further below in § V.A, even assuming, for the sake of argument, that Bibby commences litigation and prevails on its nondischargeability claims, it would not affect the feasibility and viability of the Plan.

## D.    Separation Agreement Between Debtor and Dr. Harid

The stress associated with the Debtor's loss of Danbury and his crushing debt led to disagreements with his spouse, Dr. Harid, and the breakup of his marriage. The parties decided that it would be best if they separated and entered into a separation agreement as of August 31, 2018 ("Separation Agreement"). Pursuant to the Separation Agreement they agreed to a division of all assets providing that all assets would go to Dr. Harid, and the Debtor would receive $4,000 a month from Dr. Harid as spousal maintenance. In addition, they agreed that the lease payment for a 2019 MiniCooper automobile would be borne by Dr. Harid and the lease payments for a 2016 Lexus RX60 would be borne by the Debtor.

Through tax year 2017, the Debtor filed tax returns jointly with Dr. Harid. However, he did not receive income (or at least any significant income) since 2015 when he stopped drawing salary from Danbury. Based upon the Schedules filed in the Chapter 11 Case, the Debtor claimed an entitlement to 50% of a 2017 joint federal tax refund in the amount of $70,307 (the total refund was $140,614). The funds were not received by the Debtor prior to the commencement of the Chapter 11 Case as they were deposited by the Internal Revenue Service directly to a bank account (the "Account") owned by Dr. Harid which became restrained pursuant to a temporary restraining order obtained by Bibby in an action in New York Supreme

Court, Westchester County captioned as *In the Matter of the Application of Bibby Financial Services, Inc., formerly known as Bibby International Trade Finance, Inc. vs. Citibank, N.A. and Jayalakshmi Harid* (Index No. 68053/2018). Despite notice of the bankruptcy filing, the restraint on the Account was maintained by Bibby on a post-petition basis. On or about January 19, 2019, through counsel, the Debtor demanded the prompt release of the Account or that a motion for contempt for violation of the automatic stay would be brought before the Bankruptcy Court. The restraint on the Account was thereafter released.

The Debtor has requested that Dr. Harid remit to him 50% of the 2017 joint federal tax refund in the amount of $70,307 pursuant to the case of *In re Marciano*, 372 B.R. 211 (Bankr. S.D.N.Y., 2007) (Morris, C.J.), providing for a 50/50 split as between a debtor in bankruptcy and the non-debtor spouse. Dr. Harid has apparently taken the position that pursuant to the Separation Agreement the Debtor transferred his interest in the tax refund to her. Alternately, she has apparently taken the position that the 50/50 split rule enunciated in the *Marciano* case is a minority position nationwide and that the majority of bankruptcy courts that have addressed this issue have adopted the "withholding rule" which "allocates the joint tax refund between the spouses in proportion to their respective tax withholding." *See* Carlson v. Moratzka (In re Carlson), 394 B.R. 491, 494 (8th Cir. BAP 2008) (*citing In re Kleinfeldt*, 287 B.R. 291, 292 (10th Cir. BAP 2002)). The parties are trying to resolve the matter amicably without the need for litigation and the attendant costs and delays associated with litigation. The Debtor anticipates either (a) a settlement will be reached regarding the tax refund with Dr. Harid in which case a duly noticed motion to approve a settlement pursuant to Bankruptcy Rule 9019 will be filed with the Bankruptcy Court, or (b) in the event the parties are unable to reach a settlement the Debtor will file a motion for turnover of property of the bankruptcy estate pursuant to § 541 of the Bankruptcy Code.

### E.     Avoidable Transfers

The Debtor does not intend to pursue preference, fraudulent conveyance, or other avoidance actions. The Debtor believes, after a thorough investigation and review with its counsel, that except for purposes of setoff against an Allowed Claim, there are no causes of action under §§ 510, 544, 547, 548, 550 and 553 of the Bankruptcy Code that would provide a meaningful source of funds for the Debtor.

The Debtor has disclosed on the Schedules filed with the Bankruptcy Court a transfer outside the ordinary course of business occurring within the two (2) years prior to the filing of the Chapter 11 Case. On February 28, 2017, the Debtor transferred his 50% interest in a single residential condominium known as Unit 602, 425 W 53rd Street, NY 10019 (the "425 W 53rd Street Property"), valued at $850,000, to his spouse, Dr. Harid, in exchange for her payment of a $1,000,000 obligation owed by the Debtor to Crestmark pursuant to a personal guaranty of a loan to Danbury. The personal guaranty to Crestmark was secured by a mortgage, effective as of April 11, 2016, that was recorded against the 425 W 53rd Street Property [recorded as of April 28, 2016 with the NYC Dept. of Finance, Office of the City Register as Doc. No. 2016041100329001].

The payment was not preferential as to Crestmark as it occurred more than 90 days prior to when the Debtor filed for bankruptcy, and Crestmark was a fully secured creditor, secured by property of the Debtor, that did not receive more than it would have received in a chapter 7

liquidation of the Debtor. The transfer was not a fraudulent transfer as to Crestmark because the payment was not from the Debtor, and it was in payment of an antecedent secured debt. As to the Debtor's spouse, Dr. Harid, the transfer was not preferential because it was not in payment of a pre-existing obligation by the Debtor to Dr. Harid. As to Dr. Harid the transfer was not a fraudulent transfer because Dr. Harid provided reasonably equivalent value by paying off the loan to Crestmark. In order to secure funds to pay off the Crestmark loan, Dr. Harid borrowed $1,022,800 from TD Bank secured by a mortgage on the 425 W 53rd Street Property [recorded as of January 24, 2017 with the NYC Dept. of Finance, Office of the City Register as Doc. No. 2017000030705]. Had the 425 W 53rd Street Property been sold instead, the Debtor would have realized a tax consequence. With respect to the transfer to Dr. Harid, the valuation of the Debtor's interest at $850,000 was determined based upon an appraisal obtained by TD Bank of the 425 W 53rd Street Property in connection with its loan to her.

### F. Allowance/Disallowance of Claims

Allowed Claims shall be paid in accordance with the Plan and the respective treatment provided to such claims in the Plan. Notwithstanding the foregoing, the Debtor reserves the right to object to any Claim or Administrative Claim not specified as Allowed in the Plan, or filed after the date of the Plan, and will have the power and authority to settle and compromise a disputed claim with court approval and compliance with Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). In addition, the Debtor reserves the right to amend the Schedules filed in the Chapter 11 Case regarding his listing of any Claim and, if he so amends, to amend the Plan as it pertains to any affected Creditor.

### G. Valuation of the Debtor's Assets & Projected Cash Flow Statement

The Debtor owns no real property. With respect to the Debtor's personal property a list of such property and summary of the exemptions claims for such property in the Schedules filed with the Bankruptcy Court is attached hereto as Exhibit A in the form of copies of Schedules B and C filed in the Chapter 11 Case.

A projected monthly cash flow statement for the Debtor is attached hereto as Exhibit B in the form of copies of Schedules I and J filed in the Chapter 11 Case. The Debtor projects gross monthly income from all sources of $7,000, expenses of $6,535, leaving net income of $465 to fund the monthly payments under the Plan.

## III. SUMMARY OF THE DEBTOR'S PLAN AND TREATMENT OF CLAIMS

### A. What is the Purpose of the Plan?

As required by the Bankruptcy Code, the Plan places claims in various classes and describes the treatment each Class will receive under the Plan. The Plan also states whether each Class of Claims is impaired or unimpaired.

**B.      Unclassified Claims**

Certain types of claims are automatically entitled to specific treatment under the Bankruptcy Code. They are not considered impaired, and holders of such claims do not vote on the Plan. They may, however, object if in their view their treatment under the Plan does not comply with that required by the Bankruptcy Code.  As such, the Debtor has not placed the following claims in any class:

1.      *Administrative Expenses*

Administrative expenses are costs or expenses of administering the Chapter 11 Case which are allowed under § 507(a)(2) of the Bankruptcy Code.  The Bankruptcy Code requires that all administrative expenses be paid on the effective date of the Plan, unless a particular claimant agrees to a different treatment.  Under the Plan, the Debtor does not anticipate there being any unpaid administrative expenses as of the effective date, other than professional fees, which are anticipated to total approximately $25,000.  This amount is estimated.  Actual professional fees incurred by the Debtor's Estate through February 28, 2019, in excess of the balance of any pre-petition retainer held by the retainer professional total $7,008.12.  Payment of ny administrative expenses for professional fees will require Bankruptcy Court approval upon a duly noticed application pursuant to §§ 330 and 331 of the Bankruptcy Code.

2.      *Priority Tax Claims*

Priority tax claims are unsecured income, employment, and other taxes described in § 507(a)(8) of the Bankruptcy Code.  Under the Bankruptcy Code, priority tax claims may not be paid out over period ending later than five (5) years after the date the Debtor's Chapter 11 Case was filed.  In addition, priority tax claims may not be paid in a manner less favorably than the most favored nonpriority unsecured claim.  The Debtor is current with his tax obligations and does not believe he has any Priority Tax Claims.

**C.      Classes of Claims**

The following are the classes set forth in the Plan, and the proposed treatment that they are to receive under the Plan:

1.      *Classes of Priority Unsecured Claims*

Certain priority claims that are referred to in §§ 507(a)(1), (4), (5) (6) and (7) are required to be placed in classes.  These are unsecured priority claims for: domestic support obligations, certain accrued employee compensation, certain contributions to employee benefit plans, certain claims against a grain storage facility or fish dealers, or certain claims of individuals for deposit given to a debtor.  The Debtor is not subject to any such claims and none are provided for in the Plan.

2.      *Classes of Secured Claims*

Allowed secured claims are claims secured by a Lien on property of the Debtor's bankruptcy estate to the extent of the value of such collateral, as determined in accordance with §

506(a) of the Bankruptcy Code  or, in the event such claim is subject to setoff under § 553 of the Bankruptcy Code, to the extent of such setoff.  Each allowed secured claim is required to be separately classified.

a) *Class 2 - Secured Claim of Bibby Financial Services, Inc.*
*f/k/a Bibby International Trade Finance, Inc.*

Class 2 is comprised of the secured portion of the claim of Bibby as scheduled in the Debtor's Schedules.  The security deposit posted by the Debtor in the amount of $670,000 as collateral security for a loan extended to Danbury will be surrendered as of the Effective Date of the Plan.  The Confirmation Order will constitute an order for relief from stay.  The Allowed Secured Claim of Bibby shall be satisfied in full through surrender of collateral.  Any remaining deficiency or unsecured Claim is a general Unsecured Claim and will be treated as a Class 3 Claim.  The Allowed Secured Claim of Bibby is not Impaired and Bibby is not entitled to vote this Claim under the Plan.

3.    *Class of Unsecured Claims*

General unsecured claims are not secured by property of the Estate and are not entitled to priority under § 507(a) of the Bankruptcy Code.

Class 3 contains general unsecured claims, including the balance of Bibby's Allowed Claim in excess of Bibby's Allowed Secured Claim.

The Allowed Unsecured Claims total $3,726,508 as set forth on the chart of such claims found in the Plan.  Each holder of an Allowed Unsecured Claim will be paid as follows: (a) a Pro Rata share of the Non-Exempt Property remaining after payment in full of all Allowed Administrative Claims, Allowed Administrative Professional Fee Claims, United States Trustee's Fees, and Allowed Priority Tax Claims less any reduction for the Reserve Fund, and (b) a Pro Rata share of the Reorganized Debtor's Surplus Income to be paid monthly for five (5) years (sixty (60) months total) commencing on the Distribution Date and each month thereafter consecutively for the following fifty-nine (59) months, less any reduction for the Reserve Fund. This class is impaired and is entitled to vote under the Plan.

**D.    Means of Implementing the Plan**

The Plan will be financed from (a) the Non-Exempt Property of the Reorganized Debtor remaining after payment in full of all Allowed Administrative Claims, Allowed Administrative Professional Fee Claims, United States Trustee's Fees, and Allowed Priority Tax Claims, less any reduction for the Reserve Fund, and (b) the Pro Rata share of the Reorganized Debtor's Surplus Income to be paid monthly for five (5) years (sixty (60) months total) commencing on the Distribution Date and each month thereafter consecutively for the following fifty-nine (59) months, less any reduction for the Reserve Fund.

Based upon the Schedules filed in the Chapter 11 Case the Non-Exempt Property consists of the Debtor's interest in a 2017 tax refund in the amount of $70,307.  The amount available for distribution may be reduced by the Reserve Fund.  The amount actually realized by the Debtor

from the tax return will depend on the resolution of apportionment of the tax refund with Dr. Harid discussed above in § II.D.

The Debtor's aggregate Surplus Income based upon the Debtor's Projected Disposable Income will be $27,900 based upon a Projected Disposable Income of $465 a month for a period of five years (60 months). The amount available for distribution may be reduced by the Reserve Fund and United States Trustee fees.

### E.    Tax Consequences of Plan

***The Debtor Has Not Obtained a Ruling from the IRS Nor an Opinion from Counsel With Respect to Any Tax Matter. Creditors Concerned with How the Plan May Affect Their Tax Liability Should Consult with Their Own Accountants, Attorneys, and/or Advisors.***

Although the following description is not a substitute for careful tax planning, the anticipated tax consequences of the Plan is as follows:

Each creditor will generally recognize taxable income or loss upon satisfaction of its claim in an amount that is equal to the difference between (a) the amount of cash received in respect of its claim, if any (excluding any cash or property received in respect of a claim for accrued interest) and (b) the creditor's tax basis in its claim (other than any claim for such accrued interest).

In the case of a cash basis creditor, any amounts received that are considered allocable to a claim for accrued interest will be includable as interest income. In the case of an accrual basis creditor, any amounts received that are considered allocable to a claim for accrued interest will, to the extent not previously included in gross income, be includable as interest income.

The determination of the character of such income or loss as long-term or short-term capital gain or loss or as ordinary income or loss will depend upon a number of factors, including, among other things, the tax status of the creditor, whether the claim constitutes a capital asset in the hands of the creditor, whether the claim has been held for more than one year, and whether and to what extent the creditor has previously claimed a loss or bad debt deduction (or charged a reserve for bad debts) with respect to the claim.

The Debtor believes that he will not recognize any taxable income as a result of the payment of cash in satisfaction of claims. Under the cancellation of indebtedness rules of the Internal Revenue Code of 1986, as amended, debts discharged in the context of a bankruptcy proceeding will not result in taxable income, although they will cause the reduction in, and/or elimination of, certain tax attributes of the debtor, including net operating losses.

## IV.    CONFIRMATION REQUIREMENTS AND PROCEDURES

To be confirmable, the Plan must meet the requirements listed in §§ 1129(a) or (b) of the Bankruptcy Code. These include the requirements that: the Plan must be proposed in good faith; at least one impaired class of claims must accept the Plan, without counting votes of insiders; the Plan must distribute to each creditor at least as much as the creditor would receive in a chapter 7 liquidation case, unless the creditor votes to accept the Plan; and the Plan must be feasible.

These requirements are not the only requirements listed in § 1129, and they are not the only requirements for confirmation.

## A.    Who May Vote or Object

Any party in interest may object to the confirmation of the Plan if the party believes that the requirements for confirmation are not met.

Certain parties in interest, however, are not entitled to vote to accept or reject the Plan. A creditor has a right to vote for or against the Plan only if that creditor has a claim that is both (1) allowed or allowed for voting purposes and (2) impaired.

In this case, the Debtor believes that class 3 is impaired under the Plan and that holders of claims in that class are therefore entitled to vote to accept or reject the Plan. The Debtor believes that classes 1, 2 and 4 are unimpaired and that holders of claims in these classes, therefore, do not have the right to vote to accept or reject the Plan.

### 1.    *What is an Allowed Claim?*

Only a creditor with an allowed claim has the right to vote on the Plan. Generally a claim is allowed if either (a) the Debtor has scheduled the claim on the Debtor's schedules, unless the claim has been scheduled as disputed, contingent or unliquidated, or (b) the creditor has filed a proof of claim, unless an objection has been filed to such proof of claim. When a claim is not allowed, the creditor holding the claim cannot vote unless the Bankruptcy Court, after notice and hearing, either overrules the objection or allows the claim for voting purposes pursuant to Bankruptcy Rule 3018(a).

### 2.    *What is an Impaired Claim?*

As noted above, the holder of an allowed claim has the right to vote only if it is in a class that is impaired under the Plan. As provided in § 1124 of the Bankruptcy Code, a class is considered impaired if the Plan alters the legal, equitable or contractual rights of the members of that class.

### 3.    *Who is Not Entitled to Vote?*

The holders of the following five types of claims are not entitled to vote:

- holders of claims that have been disallowed by an order of the Bankruptcy Court or as to which there is a claims objection motion pending;

- holders of other claims that are not "allowed claims" (as discussed above), unless they have been "allowed" for voting purposes;

- holders of claims in unimpaired classes;

- holders of claims entitled to priority pursuant to § 507(a)(2), (a)(3), and (a)(8) of the Bankruptcy Code ;

- holders of claims in classes that do not receive or retain any value under the Plan; and

- administrative expenses.

***Even If You Are Not Entitled to Vote on the Plan, You Have a Right to Object to the Confirmation of the Plan and to the Adequacy of the Disclosure Statement.***

4. *Who Can Vote In More Than One Class?*

A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim, or who otherwise holds claims in multiple classes, is entitled to accept or reject a plan in each capacity, and should cast one ballot for each claim.

## B. Votes Necessary to Confirm the Plan

If impaired classes exist, the Bankruptcy Court cannot confirm the Plan unless (i) at least one impaired class of creditors has accepted the Plan without counting the votes of any insiders within that class, and (ii) all impaired classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cram down" on non-accepting classes, as discussed below.

1. *Votes Necessary for a Class to Accept the Plan*

A class of claims accepts the Plan if both of the following occur: (a) the holders of more than one-half (1/2) of the allowed claims in the class, who vote, cast their votes to accept the Plan, and (b) the holders of at least two-thirds (2/3) in dollar amount of the allowed claims in the class, who vote, cast their votes to accept the Plan.

2. *Treatment of Nonaccepting Classes*

Even if one or more impaired classes reject the Plan, the Bankruptcy Court may nonetheless confirm the Plan if the nonaccepting classes are treated in the manner prescribed by § 1129(b) of the Bankruptcy Code. A plan that binds nonaccepting classes is commonly referred to as a "cram down" plan. The Bankruptcy Code allows the Plan to bind nonaccepting classes of claims if it meets all the requirements for consensual confirmation except the voting requirements of 1129(a)(8) of the Bankruptcy Code, does not "discriminate unfairly," and is "fair and equitable" toward each impaired class that has not voted to accept the Plan.

***You should consult your own attorney if a "cram down" confirmation will affect your claim, as the variations on this general rule are numerous and complex.***

## C. Liquidation Analysis

To confirm the Plan, the Bankruptcy Court must find that all creditors who do not accept the Plan will receive at least as much under the Plan as such claim holders would receive in a chapter 7 liquidation. A liquidation analysis is attached to this Disclosure Statement as <u>Exhibit __</u>. It should be noted that in a chapter 7 liquidation the bankruptcy estate would incur fees and expenses for the services of a chapter 7 trustee, and the attorneys and accountants of the chapter 7 trustee, which it will not under either the Plan.

### D. Feasibility

The Bankruptcy Court must find that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor, unless such liquidation or reorganization is proposed in the Plan.

1. *Ability to Fund the Plan*

The Debtor believes that he will have enough cash on hand on the Effective Date of the Plan to pay all the claims and expenses that are required to be paid as of the Effective Date under the Plan. The Plan will be financed from (a) the Non-Exempt Property of the Reorganized Debtor remaining after payment in full of all Allowed Administrative Claims, Allowed Administrative Professional Fee Claims, United States Trustee's Fees, and Allowed Priority Tax Claims, less any reduction for the Reserve Fund, and (b) the Pro Rata share of the Reorganized Debtor's Surplus Income to be paid monthly for five (5) years (sixty (60) months total) commencing on the Distribution Date and each month thereafter consecutively for the following fifty-nine (59) months, less any reduction for the Reserve Fund.

Based upon the Schedules filed in the Chapter 11 Case the Non-Exempt Property consists of the Debtor's interest in a 2017 tax refund in the amount of $70,307. The amount available for distribution may be reduced by the Reserve Fund.

The Debtor's aggregate Surplus Income based upon the Debtor's Projected Disposable Income will be $27,900 based upon a Projected Disposable Income of $465 a month for a period of five years (60 months). The amount available for distribution may be reduced by the Reserve Fund. In addition, the amount actually realized by the Debtor from the tax return will depend on the resolution of apportionment of the tax refund with Dr. Harid discussed above in § II.D.

2. *Ability to Make Future Plan Payments and Operate Without Further Reorganization*

The Debtor must also show that he will have enough cash over the life of the Plan to make the required Plan payments. The Debtor's aggregate Surplus Income based upon the Debtor's Projected Disposable Income will be $27,900 based upon a Projected Disposable Income of $465 a month for a period of five years (60 months). The amount available for distribution may be reduced by the Reserve Fund.

***You Should Consult with Your Accountant or other Financial Advisor If You Have Any Questions Pertaining to These Projections.***

## V. EFFECT OF CONFIRMATION OF PLAN

### A. Discharge of Debtor

The Debtor will be discharged from any debt that arose before confirmation of the Plan, subject to the occurrence of the Effective Date, as specified in § 1141(d)(5), upon completion of payments under the Plan, except that the Debtor will not be discharged of any debt (a) imposed by the Plan, and (b) pursuant to § 1141(d)(2) of the Bankruptcy Code, any debt excepted from

discharge under § 523 of the Bankruptcy Code.  After the effective date of the Plan your claims against the Debtor will be limited to the debts imposed by the Plan.

### B.      Modification or Withdrawal of Plan

The Debtor may modify the Plan at any time before confirmation of the Plan. However, the Bankruptcy Court may require a new disclosure statement and/or re-voting on the Plan.

The Debtor may also seek to modify the Plan at any time after confirmation only if (a) the Plan has not been substantially consummated, and (b) the Bankruptcy Court authorizes the proposed modifications after notice and a hearing.

The Debtor reserves the right to revoke or withdraw the Plan prior to the confirmation hearing on the Plan.

### C.      Final Decree

Once the Debtor's bankruptcy estate has been fully administered, as provided in Bankruptcy Rule 3022, the Debtor, or such other party as the Bankruptcy Court shall designate in the confirmation order, shall file a motion with the Bankruptcy Court to obtain a final decree to close the case.  Alternatively, the Bankruptcy Court may enter such a final decree on its own motion.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Dated: New York, New York
     March <u>20</u>, 2019

By:  <u>/s/ Balasubramaniam J. Harid</u>
    Balasubramaniam J. Harid


Dated: New York, New York
     March <u>20</u>, 2019

STARR & STARR, PLLC

By: <u>/s/ Stephen Z. Starr</u>
   Stephen Z. Starr
   Vildan E. Starr
260 Madison Ave., 17th Floor
New York, New York 10016
tel.:  (212) 867-8165
fax.:  (212) 867-8139
e-mail:  sstarr@starrandstarr.com

Attorneys for Balasubramaniam J. Harid.
Debtor and Debtor in Possession