**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT.**

KIRBY AISNER & CURLEY LLP
*Attorneys for the Debtor*
700 Post Road, Suite 237
Scarsdale, New York 10583
(914) 401-9500
eaisner@kacllp.com
Erica R. Aisner, Esq.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------x

| | | |
|---|---|---|
| In re: | : | Chapter 11 Case No. |
| Balasubramaniam J. Harid, | : | 18-13632 (MEW) |
| Debtor. | : | |

-----------------------------------x

## AMENDED DISCLOSURE STATEMENT

**I.     INTRODUCTION**

This disclosure statement ("Disclosure Statement") is submitted by Balasubramaniam J. Harid ("Debtor") in support of his Amended Chapter 11 Plan of Reorganization, dated January 22, 2020 ("Plan"). Unless otherwise defined herein, all capitalized terms contained herein have the meaning given to them in the Plan, a copy of which is attached hereto as Exhibit A.

**FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THIS DISCLOSURE STATEMENT, THE PLAN AND ITS EXHIBITS IN THEIR ENTIRETY**

### A. The Purpose of this Disclosure Statement

Certain creditors of the Debtor have the right to vote to accept or reject the Plan. The purpose of this Disclosure Statement is to provide information sufficient to enable such creditors to make informed judgments in exercising their right to vote on the Plan. This Disclosure Statement describes the material terms of the Plan and other related matters.

By Order dated_____, 2020, the Bankruptcy Court approved this Disclosure Statement (the "<u>Disclosure Statement Order</u>"), determining that it contains "adequate information" as that term is used in § 1125 of the Bankruptcy Code.

**THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.**

The Disclosure Statement Order also sets forth in detail the deadlines, procedures and instructions for voting to accept or reject the Plan and for filing objections to confirmation of the Plan, the Record Date for voting purposes, and the applicable standards for tabulating Ballots. In addition, detailed voting instructions accompany each Ballot. Each holder of a Claim entitled to vote on the Plan should read in their entirety the Disclosure Statement, the Plan, the Disclosure Statement Order and the instructions accompanying the Ballots before voting on the Plan. These documents contain, among other things, important information concerning the classification of Claims for voting purposes and the tabulation of votes. No solicitation of votes to accept the Plan may be made except pursuant to § 1125 of the Bankruptcy Code.

### B. Holders of Claims Entitled to Vote

Pursuant to the provisions of the Bankruptcy Code, only holders of "allowed" claims or that are "impaired" are entitled to vote to accept or reject a proposed chapter 11 plan. Classes of claims in which the holders of claims are unimpaired under a chapter 11 plan are deemed to have accepted the plan and are not entitled to vote to accept or reject the plan.

Holders of Class 1 Claims are not impaired under the Plan, are not entitled to vote on the Plan, and are deemed to accept the Plan. Classes 2 and 3 are impaired. To the extent Claims in Class 2 and 3 are Allowed Claims, the holders of such Claims are entitled to vote to accept or reject the Plan. Accordingly, the Debtor is soliciting acceptances only from holders of Allowed Claims in Classes 2 and 3.

The Bankruptcy Code defines "acceptance" of a plan by a class of Claims as acceptance by creditors in that class that hold at least two-thirds in dollar amount and more than one-half in number of the claims that cast ballots for acceptance or rejection of the plan. For a more detailed description of the requirements for confirmation of the Plan, *see* § IV, "Confirmation Requirements and Procedures" below.

Section 1129(b) of the Bankruptcy Code permits the confirmation of a plan notwithstanding the lack of acceptance of a plan by one or more impaired classes of claims. Under that section, a plan may be confirmed by a court if it does not "discriminate unfairly" and

is "fair and equitable" with respect to each non-accepting class. For a more detailed description of the requirements for confirmation of a nonconsensual plan, *see* § IV, "Confirmation Requirements and Procedures" below. The Debtor intends to seek confirmation pursuant to § 1129(b) of the Bankruptcy Code with respect to any Class that rejects the Plan.

### C.    Voting Procedures

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan. If you hold Claims in more than one Class, and you are entitled to vote Claims in more than one Class, you will receive separate Ballots which must be used for each separate Class of Claims. Please vote and return your Ballot(s). Your Ballot(s) must be delivered either by mail or personal delivery, as follows: Kirby Aisner & Curley LLP, Attn: Erica R. Aisner, Esq., 700 Post Road, Suite 237, Scarsdale, New York 10583.

TO BE COUNTED, YOUR BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED NO LATER THAN 5:00 P.M., PREVAILING EASTERN TIME, ON _____, 2020 (THE "VOTING DEADLINE").

Any Claim in an impaired class as to which an objection or request for estimation is pending or which is scheduled by the Debtor as unliquidated, disputed or contingent is not entitled to vote unless the holder of such Claim has obtained an order of the Bankruptcy Court temporarily allowing such Claim for the purpose of voting on the Plan. For additional information on voting, *see* § IV, "Confirmation Requirements and Procedures" below.

### D.    Confirmation Hearing

Pursuant to § 1128 of the Bankruptcy Code, the Confirmation Hearing will be held on _____, 2020 at ___:___ .m., in Courtroom 617, before the Honorable Michael E. Wiles, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District New York, One Bowling Green, New York, New York 10004.

The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be served and filed so that they are received on or before _____, 2020 at ___:00 a.m./p.m. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

## II.    BACKGROUND

### A.    Information Regarding the Debtor, His Employment History, Current Income and Employment

The Debtor is a 62 year old man residing in New York, New York. He is married, but legally separated from his wife, Dr. Jayalakshmi Harid ("Dr. Harid"). Dr. Harid is an Anesthesiologist and Vice Chair of the Brookdale University Hospital Department of Anesthesiology and Associate Professor of SUNY Downstate College of Medicine. The Debtor's background is as a trained chemist.

Prior to his involvement with Danbury Pharma LLC (discussed below), he was involved in various business ventures, both domestically and internationally. However, the Debtor has no interest in any business enterprises at present.

The Debtor is currently employed as a consultant by Total Nutrition Global LLC ("TNG"), which is a company engaged in the nutraceutical, nutritional supplement and sports nutrition business. He does not have any ownership interest in TNG. Under the terms of his consulting agreement with TNG he receives $3,000 a month as a base payment, and in addition is entitled to a 3% commission on any collected sales. He is also entitled to be reimbursed ordinary, necessary and reasonable business expenses that he can show were undertaken in furtherance of his duties (i.e., business related travel, and expenses incurred for dining and entertainment of prospective customers). The arrangement between the Debtor and TNG is pursuant to a written agreement, dated as of August 16, 2018, that provides for an initial trial period of five (5) years and automatic one year renewal after that, unless terminated by either party sixty (60) days prior to the expiration date.

The Debtor also receives $4,000 a month in spousal maintenance payments pursuant to a written separation agreement with Dr. Harid that is discussed in further detail below.

B.   **Events Leading to Chapter 11 Filing**

The Debtor was a co-founder of a company formed in 2008 known as Danbury Pharma LLC ("Danbury"), in which he held a majority (67%) interest. Danbury's line of business was in manufacturing and processing of pharmaceuticals and vitamins. While associated with Danbury the Debtor was in charge of product development, compliance (with FDA regulations) and oversaw operations. Another co-founder, David McLoughlin, was in charge of all the business aspects of Danbury and was President until he resigned in 2016. In 2013, Danbury entered into a factoring relationship with Crestmark Bank ("Crestmark"). In late 2015 and early 2016, while still under Mr. McLoughlin's stewardship, Danbury entered a period of significant financial distress, and had to replace its lender.

The situation was resolved by: (i) Mr. McLoughlin resigning his position and transferring his equity in Danbury to the Debtor, making the Debtor the sole owner of Danbury at that time; (ii) the Debtor's pay down of approximately $1.5 million to Crestmark; and (iii) Danbury's refinancing of the remaining approximate $1 million of debt to Crestmark.

Kevin Kelly, an experienced Chief Financial Officer and part-time consultant for Danbury was retained to assist Danbury in finding a replacement lender for Crestmark. At Mr. Kelly's suggestion Danbury obtained refinancing from Bibby International Trade Finance (now known as Bibby Financial Services, Inc.) ("Bibby"), a finance company with which he had existing contacts and relationships.

On August 2, 2016, following extensive financial due diligence by Bibby, a new $2,850,000 asset-based lending facility was established for Danbury. Danbury was allowed to borrow against eligible collateral up to $2,850,000. Eligible collateral included Danbury's inventory and eligible receivables. The Debtor also provided Bibby $675,000 to be held as cash collateral and executed a personal guaranty. In October 2016, Bibby conducted an on-site audit of Danbury's operations for the first three months of the facility which included an examination of inventory, invoices and shipping documentation. The audit did not result in any identified issues or irregularities. In

-4-

connection with the audit, Bibby was presented with a binder containing copies of all invoices included in the borrowing base calculations, with copies of corresponding bills of lading or other acceptable proofs of shipping. The Debtor had no involvement with invoicing or the preparation of the borrowing base certificate.

In November 2016, Danbury's largest customer stopped placing additional orders due to dissatisfaction with recently delivered products. Subsequently additional problems arose with Danbury's remaining customers due to a change in invoicing practices instituted by Mr. Kelly. Without any advance notice or consultation, Bibby sent certain letters to Danbury's customers in an effort to collect on the factored accounts receivable which had a collateral effect of misleading Danbury's customers that Danbury had gone out of business, would not fill new orders and was in wind down mode in which its outstanding receivables were being collected.

Despite the Debtor's efforts to turn around Danbury's operations and continue it as a viable going concern, its ability to collect receivables for goods already sold and delivered, or generate new orders, was severely and irreparably impacted due to the false impression created in the market by Bibby's demand letter to its customers that Danbury had gone out of business.

On April 3, 2017, the Debtor, Danbury and certain other plaintiffs filed an action against Bibby in the United States District Court for the Eastern District of New York captioned *Danbury Pharma, LLC et al. v. Bibby International Trade Finance, Inc.* (17-Civ-1890 (JS)(AYS) (the "Danbury Lender Liability Action") The complaint in the Danbury Lender Liability Action alleged that Bibby engaged in misconduct that caused damages to Danbury (destroying the value of an estate asset, the Debtor's ownership interest in Danbury) and warranted rescission of the Debtor's personal guaranty of the Bibby loan.

Also on April 3, 2017, Bibby commenced a lawsuit in New York Supreme Court, New York County captioned as *Bibby International Trade Finance, Inc. vs. Danbury Pharma, LLC and Balasubramaniam Harid* (Index No. 651771/2017)(the "Bibby Action"). The Bibby Action was commenced by way of a motion for summary judgment in lieu of complaint pursuant to CPLR § 321 seeking recovery of $2,850,000 plus interest, costs and attorneys' fees against Danbury pursuant to a loan and security agreement between Bibby and Danbury, and a promissory note made by Danbury in favor of Bibby in the same amount. As against the Debtor individually the Bibby Action sought the same recovery pursuant to a personal guaranty which he had executed in connection with the loan.

On June 2, 2017, the plaintiffs filed a notice of voluntary dismissal of the Danbury Lender Liability Action, and on June 14, 2017, that action was dismissed *without prejudice*.

On or about November 20, 2017, the parties to the Bibby Action entered into a settlement stipulation (the "State Court Settlement Stipulation") pursuant to which Danbury and the Debtor each stipulated to judgment in the amount of $2,850,000, and Bibby, on the one hand, and Danbury and the Debtor, on the other hand, resolved all claims that each had against the other. Also, as part of the State Court Settlement Stipulation, certain releases were granted by Bibby in favor of the Debtor's daughter, Anusha Harid, in her capacity as a minority shareholder of Danbury and based upon representations made therein.

The Debtor believes that there could be grounds to seek to void the State Court Settlement Stipulation under the Bankruptcy Code and applicable state law so the Debtor could pursue lender

liability claims for damages against Bibby for its misconduct, but the Debtor has concluded that it is not worth the cost to pursue such claims at this time. The Debtor reserves its right to do so absent confirmation of the Plan.

On December 19, 2017, a judgment (the "Bibby Judgment") pursuant to the State Court Settlement Stipulation was entered in the total amount of $2,870,989.15. Bibby has also failed to satisfy any portion of the indebtedness with the assets of Danbury which included but was not limited to receivables, inventory and equipment, which at the time funds were borrowed from Bibby were more than adequate to fully cover the loan. As such, the Debtor believes that Bibby may not have engaged in commercially reasonable activity with respect to disposition of the Danbury collateral.

Due to Bibby's aggressive efforts to enforce the Bibby Judgment which included threats to pursue his daughter and other family members without any basis in law or in fact, coupled with other debt problems with which the Debtor was faced, he determined to file chapter 11 bankruptcy to restructure his personal financial affairs.

### C. Significant Events During the Chapter 11 Case

The Debtor is current with his obligations as a debtor and debtor in possession under the Bankruptcy Code.

On February 8, 2019, pursuant to § 327 of the Bankruptcy Code, the Bankruptcy Court entered an order authorizing the Debtor to retain and employ Starr & Starr, PLLC as its counsel, *nunc pro tunc*, to November 28, 2018.

On April 16, 2019 the Court entered an Order establishing May 27, 2019 as the deadline for filing proofs of claim.

Pursuant to an Order entered on June 26, 2019, the Debtor engaged Kirby Aisner & Curley LLP as substitute counsel and an Order was entered on June 21, 2019 pursuant to which DelBello, Donnellan, Weingarten, Wise & Wiederkehr, LLP was engaged as special counsel.

The deadline to assert that the Debtor is not entitled to receive a discharge of any debts under § 1141(d)(3) of the Bankruptcy Code, or to have a debt excepted from discharge under §§ 523(a)(2), (4), or (6) expired as to all creditors and parties in interest, other than Bibby, as of March 11, 2019. While the Debtor does not believe that Bibby possesses any valid nondischargeabilty claims, the Debtor entered into a series of stipulations with Bibby extending its time to file a complaint to have its debt excepted from discharge with the latest extension running through January 17, 2020. During this time, the Debtor had attempted to negotiate a global resolution with Bibby but as of the filing of this Disclosure Statement, no resolution has been reached. On January 17, 2020, Bibby commenced an adversary proceeding against the Debtor seeking a determination that the debtor's debts to Bibby are not dischargeable under § 523(a) of the Bankruptcy Code and captioned *Bibby Financial Services, Inc. v. Balasubramaniam Jayaram Harid* (Adv. P. 20-01008 (MEW).

### D. Separation Agreement Between Debtor and Dr. Harid

The stress associated with the Debtor's loss of Danbury and his crushing debt led to disagreements with his spouse, Dr. Harid. The parties decided that it would be best if they entered

-6-

into a separation agreement as of August 31, 2018 ("Separation Agreement"). Pursuant to the Separation Agreement, all jointly owned assets as of the date of the Separation Agreement, including any benefits which accrued prior, but were realized after, would go to Dr. Harid. In exchange, the Debtor would receive $4,000 a month from Dr. Harid as spousal maintenance. In reality, little to no assets were conveyed under the Separation Agreement as the Debtor had liquidated his real property assets years prior and his interest in Danbury at that time was worthless. In addition, they agreed that the lease payment for a 2019 MiniCooper automobile would be borne by Dr. Harid and the lease payments for a 2016 Lexus RX60 would be borne by the Debtor.

Although the Debtor filed tax returns jointly with Dr. Harid, he did not receive income (or at least any significant income) since 2015 when he stopped drawing salary from Danbury. Based upon the Schedules filed in the Chapter 11 Case, the Debtor claimed an entitlement to 50% of a 2017 joint federal tax refund in the amount of $70,307 (the total refund was $140,614). This was the Debtor's only valuable asset (which interest was disputed by Dr. Harid) at the time of the Bankruptcy filing. Moreover, the funds were not received by the Debtor prior to the commencement of the Chapter 11 Case as they were in the possession of Dr. Harid having been deposited by the Internal Revenue Service directly to her personal bank account (the "Account"). The Account was subsequently restrained pursuant to a temporary restraining order obtained by Bibby in an action in New York Supreme Court, Westchester County captioned as *In the Matter of the Application of Bibby Financial Services, Inc., formerly known as Bibby International Trade Finance, Inc. vs. Citibank, N.A. and Jayalakshmi Harid* (Index No. 68053/2018). Despite notice of the bankruptcy filing, the restraint on the Account was maintained by Bibby on a post-petition basis. It was only after a threatened motion for contempt for violation of the automatic stay was the Account finally released.

The Debtor requested that Dr. Harid remit to him 50% of the 2017 joint federal tax refund in the amount of $70,307 pursuant to the case of *In re Marciano*, 372 B.R. 211 (Bankr. S.D.N.Y., 2007) (Morris, C.J.), providing for a 50/50 split as between a debtor in bankruptcy and the non-debtor spouse. Dr. Harid, who is represented by separate counsel, argued that pursuant to the Separation Agreement the Debtor transferred his interest in the tax refund to her. Alternatively, she argued that the 50/50 split rule enunciated in the *Marciano* case is a minority position nationwide and that the majority of bankruptcy courts that have addressed this issue have adopted the "withholding rule" which "allocates the joint tax refund between the spouses in proportion to their respective tax withholding." *See Carlson v. Moratzka (In re Carlson)*, 394 B.R. 491, 494 (8th Cir. BAP 2008) (*citing In re Kleinfeldt*, 287 B.R. 291, 292 (10th Cir. BAP 2002)). In order to avoid the cost of litigation and the risk associated therewith, the parties, through their respective counsel, have negotiated a resolution of this issue which has been memorialized in a Stipulation, subject to the approval of the Bankruptcy Court, whereby Dr. Harid will agree to remit 50% of the tax refund in exchange for a general release from the Debtor and the estate of all claims which either may have against her as of the Confirmation Date (the "Tax Refund Settlement"). This settlement will be memorialized in a stipulation between the parties and approval of the stipulation will be sought by the Debtor from the Court pursuant to Bankruptcy Rule 9019 simultaneously with confirmation of the Plan. The Debtor believes that the settlement falls well above the lowest level of reasonableness and should be approved by the Court.

    E.    **Avoidable Transfers**

Together with his present legal counsel, the Debtor has extensively reviewed and analyzed any transfers of the Debtor's assets and his business affairs in the six (6) years prior

to the filing of this Chapter 11 case. This investigation included real estate acquisitions and sales, financing transactions and business transactions in general. Particular focus was given to all transactions which included individuals who would be considered "insiders" under the Bankruptcy Code. The Debtor believes, after a thorough investigation and review with its counsel, that no meritorious causes of action exist under §§ 510, 544, 547, 548, 550 and 553 of the Bankruptcy Code except that, as noted above, there may be grounds for the Debtor to to seek to void the State Court Settlement Stipulation with Bibby under the Bankruptcy Code and applicable state law so the Debtor could pursue lender liability claims for damages against Bibby for its misconduct.

One transaction which was investigated was the conveyance on February 28, 2017 of the Debtor's 50% interest in a single residential condominium known as Unit 602 at 425 W 53rd Street, NY 10019 ("Unit 602"), which 50% interest was valued at $850,000, to his spouse, Dr. Harid. Unit 602 had been purchased jointly in 2016 by the Debtor and Dr. Harid for approximately $1.7 million. The majority of funds used for the purchase came from the sale of a prior condominium unit which was also owned jointly and that was sold in 2015. The proceeds from that 2015 sale (approximately $1.3 million) were placed into a 1031 exchange account pending the acquisition of Unit 602. The balance of the purchase price to purchase Unit 602 in 2016 came from personal joint savings of the Debtor and Dr. Harid. In April of 2016, a mortgage was granted to Crestmark on Unit 602 to secure further Danbury's indebtedness (which was cross-collateralized by Unit 602) and the Debtor's personal guaranty of that indebtedness.

In January, 2017, Dr. Harid refinanced Unit 602 with TD Bank in the amount of $1,022,800 to allow for a payoff of the Debtor's obligation to Crestmark in the amount of $1 million. Contemporaneously, and in consideration of the refinance and payoff of the Crestmark mortgage, the Debtor conveyed his 50% interest in Unit 602 to Dr. Harid. The value of the Debtor's 50% interest in Unit 602 at the time of his 50% transfer of interest to Dr. Harid was approximately $850,000, which was based upon an appraisal obtained by TD Bank in connection with the loan to Dr. Harid. As such, the Debtor received far greater consideration from Dr. Harid in the form of the payoff of the Crestmark obligation ($1,000,000) than Dr. Harid received from the Debtor with the conveyance of his 50% interest in Unit 602 (50% interest valued at $850,000). Based upon the foregoing, the Debtor does not believe that this transaction is avoidable; the payment/conveyance occurred more than one year prior to the bankruptcy filing so it is not avoidable as a preference and it was for fair consideration and used to pay a non-insider creditor (Crestmark) and thus is not a fraudulent conveyance.

F.    **Allowance/Disallowance of Claims**

Allowed Claims shall be paid in accordance with the Plan and the respective treatment provided to such claims in the Plan. Notwithstanding the foregoing, the Debtor reserves the right to object to any Claim or Administrative Claim not specified as Allowed in the Plan, or filed after the date of the Plan, and will have the power and authority to settle and compromise a disputed claim with court approval and compliance with Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). In addition, the Debtor reserves the right to amend the Schedules filed in the Chapter 11 Case regarding his listing of any Claim and, if he so amends, to amend the Plan as it pertains to any affected Creditor.

G. **Valuation of the Debtor's Assets & Projected Cash Flow Statement**

The Debtor owns no real property. With respect to the Debtor's personal property, a list of such property and summary of the exemptions claims for such property in the Amended Schedules filed with the Bankruptcy Court is attached hereto as Exhibit C in the form of copies of Schedules A/B and C filed in the Chapter 11 Case.

A projected monthly cash flow statement for the Debtor is attached hereto as Exhibit D in the form of copies of Schedules I and J filed in the Chapter 11 Case. The Debtor projects gross monthly income from all sources of $7,000, expenses of $6,535, leaving net income of $465 to fund the monthly payments under the Plan.

III. **SUMMARY OF THE DEBTOR'S PLAN AND TREATMENT OF CLAIMS**

A. **What is the Purpose of the Plan?**

As required by the Bankruptcy Code, the Plan places claims in various classes and describes the treatment each Class will receive under the Plan. The Plan also states whether each Class of Claims is impaired or unimpaired.

B. **Unclassified Claims**

Certain types of claims are automatically entitled to specific treatment under the Bankruptcy Code. They are not considered impaired, and holders of such claims do not vote on the Plan. They may, however, object if in their view their treatment under the Plan does not comply with that required by the Bankruptcy Code. As such, the Debtor has not placed the following claims in any class:

1. *Administrative Expenses*

Administrative expenses are costs or expenses of administering the Chapter 11 Case which are allowed under § 507(a)(2) of the Bankruptcy Code. The Bankruptcy Code requires that all administrative expenses be paid on the effective date of the Plan, unless a particular claimant agrees to a different treatment. Under the Plan, the Debtor does not anticipate there being any unpaid administrative expenses as of the effective date, other than professional fees, which are anticipated to total approximately $100,000.00, which fees are subject to Bankruptcy Court approval.

2. *Priority Tax Claims*

Priority tax claims are unsecured income, employment, and other taxes described in § 507(a)(8) of the Bankruptcy Code. Under the Bankruptcy Code, priority tax claims may not be paid out over period ending later than five (5) years after the date the Debtor's Chapter 11 Case was filed. In addition, priority tax claims may not be paid in a manner less favorably than the most favored nonpriority unsecured claim. The Debtor is current with his tax obligations and does not believe he has any Priority Tax Claims.

**C.     Classes of Claims**

The following are the classes set forth in the Plan, and the proposed treatment that they are to receive under the Plan:

*1.     Classes of Priority Unsecured Claims*

Certain priority claims that are referred to in §§ 507(a)(1), (4), (5) (6) and (7) are required to be placed in classes. These are unsecured priority claims for: domestic support obligations, certain accrued employee compensation, certain contributions to employee benefit plans, certain claims against a grain storage facility or fish dealers, or certain claims of individuals for deposit given to a debtor. The Debtor is not subject to any such claims and none are provided for in the Plan.

*2.     Classes of Secured Claims*

Allowed secured claims are claims secured by a Lien on property of the Debtor's bankruptcy estate to the extent of the value of such collateral, as determined in accordance with §506(a) of the Bankruptcy Code. Class 2 consists of the Allowed Secured Claim of Change Capital in the amount of $689,020.00 which arises out of a personal guaranty of a loan secured by Danbury from Change Capital. The Class 2 Claim is secured by a blanket lien on all of the Debtor's assets by virtue of the filing of a UCC-1 financing statement. The holder of the Class 2 Claim shall receive the full amount of the Tax Refund Settlement in full payment of its Claim. The Class 2 Claim is Impaired and is therefore entitled to vote to accept or reject the Plan.

*3.     Class of Unsecured Claims*

General unsecured claims are not secured by property of the Estate and are not entitled to priority under § 507(a) of the Bankruptcy Code. Class 3 contains general unsecured claims which total approximately

The Allowed Unsecured Claims is approximately $3.76 million dollars. Each holder of an Allowed Unsecured Claim will be paid a Pro Rata share of the Reorganized Debtor's Surplus Income to be paid quarterly for five (5) years commencing on the Distribution Date and on the first day of each quarter (every three (3) months) thereafter consecutively for a total of twenty (20) payments. This class is impaired and is entitled to vote under the Plan.

**D.     Means of Implementing the Plan**

The Plan will be financed from (a) the Anusha Plan Contribution, (b) the Tax Refund Settlement, and (c) the Pro Rata share of the Reorganized Debtor's Surplus Income to be paid monthly for five (5) years (sixty (60) months total) commencing on the Distribution Date and each month thereafter consecutively for the following fifty-nine (59) months.

The Debtor lacks the funds to satisfy his outstanding Administrative Creditors (Professionals) and therefore requires third party funding in order to confirm the Plan. His daughter, Anusha Harid has agreed to provide the necessary funding for this purpose, estimated in the amount of $100,000, in exchange for a release from the Estate of any causes of action which may exist as of the Confirmation Date. The Debtor does not believe, after consultation with his

counsel, that any viable and meritorious causes of action exist against Anusha Harid and as such, the required release is in the Estate's best interest.

The Debtor's aggregate Surplus Income based upon the Debtor's Projected Disposable Income will be not less than $27,900 based upon a Projected Disposable Income of $465 a month for a period of five years (60 months). To the extent that the Debtor is able to earn in excess of this amount, all disposable income will be contributed to the Class 3 creditors under the Plan.

### E. Tax Consequences of Plan

***The Debtor Has Not Obtained a Ruling from the IRS Nor an Opinion from Counsel With Respect to Any Tax Matter. Creditors Concerned with How the Plan May Affect Their Tax Liability Should Consult with Their Own Accountants, Attorneys, and/or Advisors.***

Although the following description is not a substitute for careful tax planning, the anticipated tax consequences of the Plan is as follows:

Each creditor will generally recognize taxable income or loss upon satisfaction of its claim in an amount that is equal to the difference between (a) the amount of cash received in respect of its claim, if any (excluding any cash or property received in respect of a claim for accrued interest) and (b) the creditor's tax basis in its claim (other than any claim for such accrued interest).

In the case of a cash basis creditor, any amounts received that are considered allocable to a claim for accrued interest will be includable as interest income. In the case of an accrual basis creditor, any amounts received that are considered allocable to a claim for accrued interest will, to the extent not previously included in gross income, be includable as interest income.

The determination of the character of such income or loss as long-term or short-term capital gain or loss or as ordinary income or loss will depend upon a number of factors, including, among other things, the tax status of the creditor, whether the claim constitutes a capital asset in the hands of the creditor, whether the claim has been held for more than one year, and whether and to what extent the creditor has previously claimed a loss or bad debt deduction (or charged a reserve for bad debts) with respect to the claim.

The Debtor believes that he will not recognize any taxable income as a result of the payment of cash in satisfaction of claims. Under the cancellation of indebtedness rules of the Internal Revenue Code of 1986, as amended, debts discharged in the context of a bankruptcy proceeding will not result in taxable income, although they will cause the reduction in, and/or elimination of, certain tax attributes of the debtor, including net operating losses.

### IV. CONFIRMATION REQUIREMENTS AND PROCEDURES

To be confirmable, the Plan must meet the requirements listed in §§ 1129(a) or (b) of the Bankruptcy Code. These include the requirements that: the Plan must be proposed in good faith; at least one impaired class of claims must accept the Plan, without counting votes of insiders; the Plan must distribute to each creditor at least as much as the creditor would receive in a chapter 7 liquidation case, unless the creditor votes to accept the Plan; and the Plan must be feasible.

These requirements are not the only requirements listed in § 1129, and they are not the only requirements for confirmation.

### A. Who May Vote or Object

Any party in interest may object to the confirmation of the Plan if the party believes that the requirements for confirmation are not met.

Certain parties in interest, however, are not entitled to vote to accept or reject the Plan. A creditor has a right to vote for or against the Plan only if that creditor has a claim that is both (1) allowed or allowed for voting purposes and (2) impaired.

In this case, the Debtor believes that class 3 is impaired under the Plan and that holders of claims in that class are therefore entitled to vote to accept or reject the Plan. The Debtor believes that classes 1, 2 and 4 are unimpaired and that holders of claims in these classes, therefore, do not have the right to vote to accept or reject the Plan.

*1. What is an Allowed Claim?*

Only a creditor with an allowed claim has the right to vote on the Plan. Generally a claim is allowed if either (a) the Debtor has scheduled the claim on the Debtor's schedules, unless the claim has been scheduled as disputed, contingent or unliquidated, or (b) the creditor has filed a proof of claim, unless an objection has been filed to such proof of claim. When a claim is not allowed, the creditor holding the claim cannot vote unless the Bankruptcy Court, after notice and hearing, either overrules the objection or allows the claim for voting purposes pursuant to Bankruptcy Rule 3018(a).

*2. What is an Impaired Claim?*

As noted above, the holder of an allowed claim has the right to vote only if it is in a class that is impaired under the Plan. As provided in § 1124 of the Bankruptcy Code, a class is considered impaired if the Plan alters the legal, equitable or contractual rights of the members of that class.

*3. Who is Not Entitled to Vote?*

The holders of the following five types of claims are not entitled to vote:

- holders of claims that have been disallowed by an order of the Bankruptcy Court or as to which there is a claims objection motion pending;
- holders of other claims that are not "allowed claims" (as discussed above), unless they have been "allowed" for voting purposes;
- holders of claims in unimpaired classes;
- holders of claims entitled to priority pursuant to § 507(a)(2), (a)(3), and (a)(8) of the Bankruptcy Code ;
- holders of claims in classes that do not receive or retain any value under the Plan; and

- administrative expenses.

***Even If You Are Not Entitled to Vote on the Plan, You Have a Right to Object to the Confirmation of the Plan and to the Adequacy of the Disclosure Statement.***

4. *Who Can Vote In More Than One Class?*

A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim, or who otherwise holds claims in multiple classes, is entitled to accept or reject a plan in each capacity, and should cast one ballot for each claim.

**B.    Votes Necessary to Confirm the Plan**

If impaired classes exist, the Bankruptcy Court cannot confirm the Plan unless (i) at least one impaired class of creditors has accepted the Plan without counting the votes of any insiders within that class, and (ii) all impaired classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cram down" on non-accepting classes, as discussed below.

1. *Votes Necessary for a Class to Accept the Plan*

A class of claims accepts the Plan if both of the following occur: (a) the holders of more than one-half (1/2) of the allowed claims in the class, who vote, cast their votes to accept the Plan, and (b) the holders of at least two-thirds (2/3) in dollar amount of the allowed claims in the class, who vote, cast their votes to accept the Plan.

2. *Treatment of Nonaccepting Classes*

Even if one or more impaired classes reject the Plan, the Bankruptcy Court may nonetheless confirm the Plan if the nonaccepting classes are treated in the manner prescribed by § 1129(b) of the Bankruptcy Code. A plan that binds nonaccepting classes is commonly referred to as a "cram down" plan. The Bankruptcy Code allows the Plan to bind nonaccepting classes of claims if it meets all the requirements for consensual confirmation except the voting requirements of 1129(a)(8) of the Bankruptcy Code, does not "discriminate unfairly," and is "fair and equitable" toward each impaired class that has not voted to accept the Plan.

***You should consult your own attorney if a "cram down" confirmation will affect your claim, as the variations on this general rule are numerous and complex.***

**C.    Liquidation Analysis**

To confirm the Plan, the Bankruptcy Court must find that all creditors who do not accept the Plan will receive at least as much under the Plan as such claim holders would receive in a chapter 7 liquidation. A liquidation analysis is attached to this Disclosure Statement as <u>Exhibit E</u>. It should be noted that in a chapter 7 liquidation the bankruptcy estate would incur fees and expenses for the services of a chapter 7 trustee, and the attorneys and accountants of the chapter 7 trustee, which it will not under either the Plan.

### D.  Feasibility

The Bankruptcy Court must find that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor, unless such liquidation or reorganization is proposed in the Plan.

The Debtor will provide proof of funds on Confirmation necessary for the amounts due on the Distribution Date. With respect to the payments to Class 3 under the Plan, the Debtor submits that its disposable income has been consistent as is evidenced in his monthly operating reports and as such, it supports his ability to fund payments on a going forward basis.

***You Should Consult with Your Accountant or other Financial Advisor If You Have Any Questions Pertaining to These Projections.***

## V.  EFFECT OF CONFIRMATION OF PLAN

### A.  Discharge of Debtor

The Debtor will be discharged from any debt that arose before confirmation of the Plan, subject to the occurrence of the Effective Date, as specified in § 1141(d)(5), upon completion of payments under the Plan, except that the Debtor will not be discharged of any debt (a) imposed by the Plan, and (b) pursuant to § 1141(d)(2) of the Bankruptcy Code, any debt excepted from discharge under § 523 of the Bankruptcy Code. After the effective date of the Plan your claims against the Debtor will be limited to the debts imposed by the Plan.

### B.  Modification or Withdrawal of Plan

The Debtor may modify the Plan at any time before confirmation of the Plan. However, the Bankruptcy Court may require a new disclosure statement and/or re-voting on the Plan.

The Debtor may also seek to modify the Plan at any time after confirmation only if (a) the Plan has not been substantially consummated, and (b) the Bankruptcy Court authorizes the proposed modifications after notice and a hearing.

The Debtor reserves the right to revoke or withdraw the Plan prior to the confirmation hearing on the Plan.

### C.  Final Decree

Once the Debtor's bankruptcy estate has been fully administered, as provided in Bankruptcy Rule 3022, the Debtor, or such other party as the Bankruptcy Court shall designate in the confirmation order, shall file a motion with the Bankruptcy Court to obtain a final decree to close the case. Alternatively, the Bankruptcy Court may enter such a final decree on its own motion.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Dated: New York, New York
      January 22, 2020

By: */s/ Balasubramaniam J. Harid*
Balasubramaniam J. Harid

Dated: New York, New York
      January 22, 2020

KIRBY AISNER & CURLEY LLP
*Attorneys for the Debtor*

By: */s/ Erica R. Aisner*
Erica R. Aisner, Esq.
700 Post Road, Suite 237
Scarsdale, New York 10583
(914) 401-9500
eaisner@kacllp.com